Case 3:11-cv-00054-GEC   Document 19   Filed 12/16/11   Page 1 of 18   Pageid#: 77

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 16 2011

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MICHAEL JAMES KEITZ, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 3:11-cv-00054 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| UNNAMED SPONSORS OF COCAINE ) | By: Hon. Glen E. Conrad |
| RESEARCH STUDY, et al., ) | Chief United States District Judge |
| ) | |
| Defendants. ) | |

The plaintiff, Michael James Keitz (Keitz or plaintiff), proceeding pro se, filed this amended complaint on November 14, 2011, bringing two claims under 42 U.S.C. § 1983 and one state law technical battery claim. The defendant had filed the original pro se complaint on August 26, 2011. However, on September 1, 2011, after granting the plaintiff's contemporaneously filed motion to proceed in forma pauperis, the court dismissed the original complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), concluding that the plaintiff had failed to state a claim upon which relief could be granted and that the plaintiff's claims were frivolous. (Docket No. 3.) After conducting an initial screening of the amended complaint, the court concludes that the plaintiff's § 1983 claims must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B). With the plaintiff's federal claims being dismissed, the court will decline to exercise supplemental jurisdiction over the remaining state law claim.

### Factual Background

Slight variances in the facts presented in the original complaint and in the amended complaint prompt the court to summarize the facts anew based on the allegations in the amended complaint.[1]

---

[1] For purposes of this opinion, the court will assume that the facts as presented in the plaintiff's amended complaint are true and accurate. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).

According to the amended complaint, the plaintiff responded in the summer of 2009 to radio advertisements and applied to participate in a medical study at the University of Virginia's Center for Addiction Research and Education (UVA Care). (Docket No. 17 at 1–2.) After extensive physical tests performed by an unnamed male nurse (Unnamed Nurse 1), UVA Care accepted the plaintiff's application and instructed him that he would stay for nine days in UVA Care, beginning on September 7, 2009, during the administration of the study. (Id. at 2.) As part of the study, the plaintiff would orally ingest the drug Topiramate and, subsequently, would be injected with cocaine for the "ostensibl[e]" purpose of testing Topiramate's effect on a drug user's desire for cocaine. (Id.) According to the plaintiff, he ingested doses of Topiramate, received four cocaine injections, and otherwise completed the nine-day study "without incident, except for some panic and discomfort surrounding the 4 cocaine injections he underwent." (Id.)

In addition to this panic and discomfort, the plaintiff alleges that, during the study, both he and another participant "were subjected to odd interrogational questioning by staff while still under the influence of the test drugs." (Id.) As part of the interrogational techniques allegedly employed against them, the UVA Care staff asked the plaintiff and the other participant to "name random words starting with a certain letter in a 60 second time-frame." (Id.) The plaintiff expounds in his amended complaint on this particular interrogational technique:

> 8. This plaintiff was astonished at his ability to rattle off multi syllable words, often exclaiming afterward—"is that a word?" [and] not knowing from whence such word came!
> 9. Then the plaintiff's mind seemed to just as quickly to [sic] fail him [and] he couldn't think of any word at all (relevant to the test).
> 10. When plaintiff reported this discrepancy in ability to answer to the questioner, she replied[,] "That's common."
> 11. At one point immediately following an injection [of cocaine], plaintiff's co-participant's heart rate skyrocketed on the monitor. The man then

> stood up launching into a 5 minute diatribe of his most personally held regrets [and] short comings. 20 minutes later, he exclaimed[,] "I don't know why I said that stuff . . . Nothing like that has ever happened to me before."

(Id. at 3.)

UVA Care discharged the plaintiff after the nine-day study, furnishing the plaintiff with written instructions to report immediately to the emergency room in the event that he experienced certain "physical [or] manic symptoms." (Id.) At about the time of his release, on or about September 16 or 17, the plaintiff began to experience some of the symptoms identified in the instructions, namely, euphoria and increased hearing sensitivity. (Id.) On September 18, according to the amended complaint, these symptoms "took a turn for the worse with the sudden arrival of tingling/numbness in the face, coupled with intense fear of being a victim of a poisoning conspiracy." (Id.) With the advent of these intensified symptoms, the plaintiff was transported by ambulance to the emergency room at the University of Virginia Medical Center (UVA ER), the site of the drug study. (Id.) The plaintiff communicated to the UVA ER staff his participation in the Topiramate and cocaine study. (Id. at 3–4.) The UVA ER staff then directed the plaintiff to linger in the lobby "where he suffer[ed] alone w/facial paralysis [and] panic." (Id. at 4.) After hours of waiting in this "fearful state," a woman summoned him to the window. (Id.) While at the window, the plaintiff spoke to the woman about the UVA ER staff's inaction toward his "serious medical and psychiatric needs." (Id.) After this conversation, the plaintiff was unable to walk back to his seat and collapsed on the floor in front of the window. (Id.) The woman to whom he spoke at the window "disdainfully inform[ed him] he 'can't sit [there].'" (Id.) A nurse who passed the plaintiff as he lay collapsed on the floor remarked, "That guy[']s crazy." (Id.)

According to the amended complaint, the plaintiff repeatedly phoned his parents in North Carolina during his hours of waiting in the UVA ER, relating to them his situation. (Id.) His parents phoned the hospital to inquire why the UVA ER staff "fail[ed] to 'lift a finger' to aid their son." (Id.)

Finally, the plaintiff alleges, "after more lengthy delay and parental intervention," the UVA ER staff led the plaintiff to an "isolated (storage type) area out of earshot of other patients." (Id.) Three doctors (Unnamed Doctors 4, 5, and 6) then entered the room. (Id.) The plaintiff explained to them his symptoms and that he "feels his 'eye vein' is why he is ill." (Id.) Obviously, the plaintiff alleges, "this puts staff (again) on notice of a serious medical [and] mental condition, known to exist for hours on end, [and] a byproduct of a drug study in their hospital, gone awry." (Id.) The three doctors left the room and, shortly thereafter, a female nurse appeared, administered valium to the plaintiff, and ushered him out of the hospital. (Id.)

The plaintiff's "fullblown mania" persisted into the following morning. (Id.) The plaintiff phoned the female research assistant from the drug study (Unnamed Nurse 3) and spoke with her repeatedly that morning, noting that she "act[ed] nervous but offer[ed] no help." (Id. at 4–5.) The plaintiff continued to contact the UVA Care staff for the next several days, communicating his symptoms and his experience at the UVA ER. (Id. at 5.) Furthermore, the amended complaint alleges, the plaintiff transmitted several emails to the director of UVA Care. (Id.) However, the plaintiff alleges, his efforts to seek help from UVA Care proved fruitless—"nothing was done to remedy the physical [and] psychological dangers plaintiff faced, that UVA Care [and] UVA Medical Center created." (Id.) The plaintiff notes that, in response to his phone calls and email messages, the UVA Care staff informed him that a nurse would call him back; however, the plaintiff alleges, this nurse never called him back. (Id.)

After receiving no response from UVA Care, the plaintiff elected to travel to Florida to cure himself of facial paralysis, which "a manic-delusional plaintiff feels is caused by 'demons.'" (Id.) However, before boarding a bus, the plaintiff abandoned most of his personal possessions in Charlottesville, alleging that this decision stemmed from his troubled mental state. (Id.) Shortly after departing Charlottesville, the plaintiff received a phone call from a doctor involved with the UVA Care drug study (Unnamed Doctor 2). (Id.) The plaintiff reported to this doctor his destination and related "the egregious lack of care received by the 3 E.R. doctors." (Id.) The plaintiff arrived in Florida without receiving any further contact from UVA Care. (Id.) During his time in Florida, the plaintiff "wander[ed] homeless for days" in an "anxiety filled psychological haze" as the "facial paralysis [and] manic state continue[d] unabated." (Id.)

After the plaintiff's symptoms subsided, he decided to leave Florida and travel to New York. (Id.) However, before boarding a bus, the plaintiff phoned the UVA Care doctor involved with the drug study and inquired whether the doctor desired to examine the plaintiff. (Id. at 6.) The doctor declined, stating that the plaintiff had "experienced problems" from the study. (Id.) Thereafter, the plaintiff travelled to New York, where his mental health deteriorated. (Id.) While in New York, the plaintiff experienced a serious panic attack and was admitted to Olean General Hospital's "psych unit," where he remained for seven to ten days. (Id.) According to the plaintiff, he was diagnosed with anxiety disorder and, to this day, continues to struggle with "panic attacks that were non-existent prior to his participation in, [and] denial of treatment after, the botched experiment at UVA Care." (Id.)

## Standard of Review

Under 28 U.S.C. § 1915, which governs in forma pauperis proceedings, the court bears a mandatory duty to screen initial filings. Eriline Co. v. Johnson, 440 F.3d 648, 656–57 (4th Cir. 2006). Specifically, "a district court must dismiss an action that the court finds to be frivolous or

5

malicious or that fails to state a claim." Michau v. Charleston Cnty., S.C., 434 F.3d 725, 728 (4th Cir. 2006) (citing 28 U.S.C. § 1915(e)(2)(B)).

The standard of review for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) also applies to a dismissal for failure to state a claim under § 1915(e)(2)(B). Newsome v. EEOC, 301 F.3d 227, 231 (5th Cir. 2002). Thus, in reviewing a complaint under this statute, the court must "accept as true all well-pleaded allegations" and construe those allegations in the light most favorable to the plaintiff. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint need not assert detailed factual allegations, but must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Furthermore, even assuming the factual allegations in the complaint are true, they "must be enough to raise a right to relief above the speculative level." Id.

## Discussion

The plaintiff names as defendants in the amended complaint the following: the Commonwealth of Virginia, the University of Virginia, the Rector and Visitors of the University of Virginia, the University of Virginia Medical Center, UVA Care, the Director of UVA Care, the unnamed sponsors of UVA Care's cocaine research study, and various unnamed nurses and doctors from UVA Care and the UVA ER.[2] (Docket No. 17 at 1.) The plaintiff articulates three claims in his amended complaint. Count I is brought against the "UVA [ER] staff." (Id. at 7.) The plaintiff brings this cause of action under 42 U.S.C. § 1983, alleging that the UVA ER staff violated his substantive due process rights by failing to provide him with timely treatment and thereby failing to protect him from the risks posed by his medical condition, in contravention of

---

[2] Although the plaintiff names all of these defendants on the title page of his amended complaint (Docket No. 17 at 1), the portion of his amended complaint in which he sets forth his individual causes of action shows, as explained below, that he brings his specific claims against only some of these defendants. (Id. at 7–9.)

the principle announced in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989). Count II, which represents another DeShaney claim, is brought against the "UVA Care Director [and] staff." (Id. at 8.) The plaintiff alleges that the UVA Care Director and staff failed to protect him from the medical risks induced by the drug study when they proved unresponsive to his efforts to reach out to them after his UVA ER visit. Count III is brought against UVA Care. (Id. at 9.) This cause of action represents a technical battery claim under Virginia law[3] in which the plaintiff alleges that UVA Care exceeded the scope of the plaintiff's consent when it utilized "intense questioning" in the course of the drug study after the plaintiff consented to participate only in a study that had as its purpose the testing of Topirimate's effect on cocaine cravings. In performing its screening function with respect to these claims, the court bifurcates its analysis and considers first the DeShaney claims and then the technical battery claim.

I. **DeShaney claims**

   A. **Procedural grounds for dismissal**

By enacting 42 U.S.C. § 1983, Congress created a remedy for deprivations of constitutional rights committed by persons acting under color of state law. 42 U.S.C. § 1983; Haywood v. Drown, 129 S. Ct. 2108, 2111 (2009). The statute's text imposes several sweeping limitations on the scope of § 1983. See Dist. of Columbia v. Carter, 409 U.S. 418, 424 (1973) (observing that § 1983 "is of only limited scope"). First, although Congress can abrogate a state's sovereign immunity, it did not do so through its enactment of § 1983. Quern v. Jordan, 440 U.S. 332, 345 (1979). Hence, as long as a state does not voluntarily waive its sovereign

---

[3] As explained below, infra pp. 17–18, the state law technical battery claim fails to invoke either the court's federal question jurisdiction or the court's diversity jurisdiction. Furthermore, because the court will dismiss the only claims in this action over which it has original jurisdiction—the plaintiff's § 1983 claims—the court, as explained below, will decline to exercise supplemental jurisdiction over the state law technical battery claim. 28 U.S.C. § 1367(c)(3).

immunity, it is immune from suit under § 1983. Edelman v. Jordan, 415 U.S. 651, 673 (1974). Another limitation imposed upon § 1983 is that the statute applies only to "person[s]" acting under color of state law. 42 U.S.C. § 1983.

Keeping in mind these broad limitations on the scope of § 1983, the court now turns to examine whether any of the defendants named by the plaintiff fall outside of § 1983's scope. First, the court notes that the Commonwealth of Virginia is immune from suit under § 1983 pursuant to the Eleventh Amendment. McConnell v. Adams, 829 F.2d 1319, 1328–29 (4th Cir. 1987). The court further notes that the University of Virginia, the University of Virginia Medical Center, UVA Care, and the Rector and Visitors of the University of Virginia[4] likely constitute arms of the state for Eleventh Amendment purposes and, thus, are also likely immune from suit under § 1983.[5] Will v. Mich. Dep't of State Police, 491 U.S. 58, 70 (1989); see also, e.g., Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 262–63 (4th Cir. 2005) (observing that numerous circuit courts, including the Fourth Circuit, have held that public state universities qualify as arms of the state under the Eleventh Amendment); Tigrett v. Rector & Visitors of Univ. of Va., 97 F. Supp. 2d 752, 756 (W.D. Va. 2000) (holding that the Rector and Visitors of the University of Virginia constitute an arm of the state and, thus, are immune from suit in federal court pursuant to the Eleventh Amendment); Hall v. Roberts, 548 F. Supp. 498, 500–01 (W.D. Va. 1982) (stating that "it is undisputed that the University of Virginia's Medical Center, which is composed of the hospital, the medical school and the nursing school, is . . . an organ of

---

[4] Additionally, the University of Virginia, the University of Virginia Medical Center, and UVA Care are improper defendants because they are divisions of the Rector and Visitors of the University of Virginia. Johnson v. Univ. of Va. Med. Ctr., Civil No. 3:06cv00061, 2007 WL 137111, at *4 (W.D. Va. Jan. 17, 2007); see also Hall v. Roberts, 548 F. Supp. 498, 499–501 (W.D. Va. 1982).

[5] The court does not rely on the conclusion regarding these defendants' status as arms of the state as the basis for dismissing the plaintiff's complaint, inasmuch as the court would have to make additional factual determinations with respect to the nature and character of the defendants in its application of the four-factored test that governs consideration of whether an entity qualifies as an arm of the state for Eleventh Amendment purposes. See Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456, 457–58 (4th Cir. 1987). As will be explained below, there are other more fundamental bases for dismissal of this case.

8

the State," and thus, is immune from suit in federal court). Additionally, the court observes that the Director of UVA Care in his official capacity and the various unnamed defendants in their official capacities are immune from suit pursuant to the Eleventh Amendment. Kentucky v. Graham, 473 U.S. 159, 167 & n.14 (1985) (citing Ex parte Young, 209 U.S. 123 (1908)).

Second, these same defendants—the Commonwealth of Virginia, the University of Virginia Medical Center, UVA Care, the Rector and Visitors of the University of Virginia, the Director of UVA Care in his official capacity, and the various unnamed defendants in their official capacities—are not "person[s]" within the meaning of § 1983. See Will, 491 U.S. at 70–71 (holding that states, state governmental entities considered arms of the state for Eleventh Amendment purposes, and state officials acting in their official capacity are not persons within the scope of § 1983); Weller v. Dep't of Social Servs. for City of Balt., 901 F.2d 387, 396 (4th Cir. 1990) (noting that states, state agencies, and state officials are not persons within the meaning of § 1983).

B.  **Substantive grounds for dismissal**

Even though, as discussed above, certain of the defendants are both immune from suit and not persons under § 1983, this analysis does not apply to the remaining defendants in their individual capacities. However, the plaintiff's DeShaney claims nonetheless fail against these individual defendants because the plaintiff's amended complaint is deficient as a matter of law with respect to the § 1983 claims.

As stated above, § 1983 affords litigants a remedy for deprivations of constitutional rights committed by persons acting under color of state law. In this action, the plaintiff alleges that the defendants violated his Fourteenth Amendment substantive due process rights. (Docket No. 17 at 7.) "The Due Process Clause of the Fourteenth Amendment bars States from 'depriv[ing] any person of life, liberty, or property, without due process of law.'" Doe ex rel. Johnson v. S.C.

9

Dep't of Social Servs., 597 F.3d 163, 170 (4th Cir. 2010) (quoting U.S. Const. amend. XIV, § 1), cert. denied, 131 S. Ct. 392 (2010). "The Clause 'guarantees more than fair process.'" Id. (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion)). "It 'also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests.'" Id. (quoting Troxel, 530 U.S. at 65).

The Fourth Circuit has recognized that the substantive prong of the Fourteenth Amendment's Due Process Clause "protects a set of interests—life, liberty, and property—that are also protected by state tort law." Waybright v. Frederick Cnty., Md., 528 F.3d 199, 204 (4th Cir. 2008), cert. denied, 129 S. Ct. 725 (2008). Thus, "there is some risk of the Clause supplanting state tort law in almost any suit alleging that a local official has caused harm." Id. "In case after case, the Supreme Court has rejected this prospect and spurned any approach to the Fourteenth Amendment that would make it 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" Id. (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)). For this reason, the Fourth Circuit has stated that, "where a claim sounds both in state tort law and substantive due process, state tort law is the rule and due process the distinct exception." Id. at 205. "In other words, the Supreme Court has established a strong presumption that § 1983 due process claims which overlap state tort law should be rejected . . . ." Id. However, this presumption is rebuttable: "It can be overcome by showing governmental conduct so 'arbitrary' and 'egregious' that it 'shocks the conscience,' usually because a state actor intended harm without justification." Id. (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845–46, 849 (1998). In the instant case, the plaintiff's § 1983 substantive due process claims overlap state tort law;[6] thus, there is a presumption against his § 1983 claims. Id. at 205–06.

---

[6] In fact, the court notes that the plaintiff's original complaint in this action alleged causes of action for medical malpractice, medical negligence, and technical battery. (Docket No. 2.) The court further notes that his amended complaint also alleges a claim for technical battery.

"The most likely path for overcoming the presumption is closed, for under no construction of events could [the defendants] be said to have intended [Keitz's resulting medical problems]. And to the extent [the defendants were] negligent, the claim[s are] not . . . constitutional one[s] and the presumption stands." Id. at 206. Hence, the plaintiff's "only option is to argue, against a presumption to the contrary, that this case presents one of those special circumstances in which culpability in the middle range—here, deliberate indifference—should shock the conscience to such an extent that a federal action lies." Id.

Bearing in mind these overarching factors governing the law surrounding substantive due process, the court now proceeds to consider the specific substantive due process right at issue in this case. In DeShaney, the Supreme Court recognized a substantive due process right to reasonable safety and security and also recognized a corresponding affirmative duty of the state to provide care and protection to particular individuals. DeShaney, 489 U.S. at 198; Doe ex rel. Johnson, 597 F.3d at 171. The Deshaney Court elaborated on this right and its accompanying duty:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney, 489 U.S. at 199–200 (citation and footnote omitted).

However, the Due Process Clause imposes this affirmative duty on the state in only two limited circumstances. First, this duty is triggered when the state accomplishes an affirmative act of involuntary restraint against an individual's freedom to act on his own behalf. See id. at 200 ("In the substantive due process analysis, it is the State's affirmative act of restraining the

11

individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ."); Pinder v. Johnson, 54 F.3d 1169, 1175 (4th Cir. 1995) ("Some sort of confinement of the injured party—incarceration, institutionalization, or the like—is needed to trigger the affirmative duty. This Court has consistently read DeShaney to require a custodial context before any affirmative duty can arise under the Due Process Clause." (citation omitted)), cert. denied, 116 S. Ct. 530 (1995). Second, the state's duty to protect also arises when the state, through affirmative conduct, increases or creates the danger that results in harm to the individual. Pinder, 54 F.3d at 1175; Mills v. City of Roanoke, 518 F. Supp. 2d 815, 819 (W.D. Va. 2007) (citing Butera v. Dist. of Columbia, 235 F.3d 637, 649 (D.C. Cir. 2001)). Circuit courts have derived this state endangerment concept from language in the DeShaney opinion which provides that, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." Mills, 518 F. Supp. 2d at 819 (citing DeShaney, 489 U.S. at 201)).

Hence, the issue becomes whether the plaintiff has alleged sufficient facts in the amended complaint to demonstrate that the state's affirmative duty to protect him was triggered by one of the two situations outlined above. If the plaintiff has alleged sufficient facts, then his § 1983 substantive due process claims against individual defendants may go forward. On the other hand, if he has failed to allege sufficient facts to trigger the state's affirmative duty, then his § 1983 claims must be dismissed. Applying the facts as alleged by the plaintiff in the amended complaint to the law as delineated above, and bearing in mind the contrary presumption under which the plaintiff labors, Waybright, 528 F.3d at 205, the court is constrained to conclude that the plaintiff has failed to plead sufficient facts to trigger the state's affirmative duty to protect him from the injury allegedly caused by the UVA Care drug study. First, the court notes the

12

absence of any affirmative act of restraint by the state akin to imprisonment or institutionalization. Indeed, the plaintiff acted voluntarily when he elected to participate in the drug study and when he elected to go to the UVA ER—neither the UVA Care staff nor the UVA ER staff employed force to coerce him to participate in the study or to enter the emergency room. See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 128 (1992) (holding that a city employee in a dangerous workplace is not in a custodial relationship because he has "voluntarily accepted[] an offer of employment"); Waybright, 528 F.3d at 207 (concluding that no confinement or restraint existed when a supervising firefighter conducted an exercise session that resulted in a subordinate firefighter's heat-related death because the subordinate "was free to walk away from the exercise session and the job").

Furthermore, the plaintiff operated under no involuntary, state-imposed restraints when the UVA Care staff allegedly proved unresponsive to his attempts to contact them after his UVA ER visit. See, e.g., DeShaney, 489 U.S. at 199–200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." (emphasis added)); id. at 200 (providing that "it is the State's affirmative act of restraining the individual's freedom to act" that triggers the substantive due process right to protection from the state (emphasis added)); Youngberg v. Romeo, 457 U.S. 307, 324 (1982) (holding that the Fourteenth Amendment provides that disabled persons who are involuntarily committed to a state hospital retain "constitutionally protected interests in conditions of reasonable care and safety"); Pinder, 54 F.3d at 1174–75 (recognizing that the state's affirmative duty to protect arises "when the state restrains persons from acting on their own behalf," and noting that "[s]ome sort of confinement of the injured party—incarceration, institutionalization, or the like—is needed to trigger the affirmative duty" (emphasis added)); Milburn v. Anne Arundel Cnty. Dep't of Social Servs., 871

F.2d 474, 476 (4th Cir. 1989) (concluding that the plaintiff child had no right to affirmative protection by the state because the state, "by the affirmative exercise of its power had <u>not</u> restrained the [child]'s liberty; he was <u>voluntarily</u> placed in the foster home by his natural parents" (emphasis added)), <u>cert. denied</u>, 110 S. Ct. 148 (1989). Therefore, because neither the UVA Care staff nor the UVA ER staff exerted any affirmative act of involuntary restraint against the plaintiff, the facts as alleged in the amended complaint fail to give rise to the first circumstance that triggers the state's duty to protect.

      Second, the court likewise concludes that the state did not create the danger that resulted in harm to the plaintiff. In <u>Waybright v. Frederick County, Maryland</u>, 528 F.3d 199 (4th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 725 (2008), a unanimous panel of the Fourth Circuit dispensed with a state-created danger argument where a supervising firefighter conducted a vigorous physical training session that resulted in the heat-related death of a newly recruited firefighter. <u>Id.</u> at 207–08. If a grueling physical training session, managed under the auspices of the state, that resulted in death did not qualify as a state-created danger, then it seems unlikely that a low-key state-sponsored drug study that resulted in medical problems would constitute a state-created danger. <u>Id.</u>; see also <u>Rutherford v. City of Newport News, Va.</u>, 107 F.3d 867, 1997 WL 82629, at *1 (4th Cir. 1997) (unpublished table decision) (concluding that no state-created danger existed when a city police department concocted an "ill-conceived, hastily prepared, and poorly executed undercover operation" that resulted in an officer's death); <u>Slaughter v. Mayor & City Council of Balt.</u>, 757 F. Supp. 2d 548, 553–54 (D. Md. 2010) (concluding that a recruit's death during a "live burn" training exercise did not result from a state-created danger). Additionally, the plaintiff in the instant case participated voluntarily in the UVA Care drug study after willfully applying for and gaining admission to the program and, therefore, cannot allege that UVA Care created the danger that resulted in his harm. See <u>Slaughter</u>, 757 F. Supp. 2d. at 552–

14

53 ("The Fourth Circuit has been careful, however, to limit the state-created danger exception to cases in which the state has compelled the injured person to encounter the danger . . . . If the employee voluntarily encounters the risk, the exception does not apply."); see also id. at 553 (noting that the theory behind the state-created danger doctrine "is that a state actor should be liable when that actor affirmatively puts a victim in harm's way without giving the victim a choice about whether to face the peril or not"); id. (concluding that the victim's "option of declining to participate [in a live-fire training session was] sufficient to defeat the [state-created danger] claim"); Mills, 518 F. Supp. 2d at 820–22 (discussing cases in which circuit courts found state-created danger, all of which involved plaintiffs who made no affirmative choice knowingly to associate themselves with the circumstance that spawned the danger resulting in harm). Furthermore, the court notes the inherent risks associated with participating in a drug study that involves receiving cocaine injections and ingesting another drug. See Estate of Phillips v. Dist. of Columbia, 455 F.3d 397, 407 (D.C. Cir. 2006) (observing the risks associated with a firefighter's job and concluding that "the District is not constitutionally obliged by the Due Process Clause to protect public employees from inherent job-related risks").

In any event, the plaintiff's state-created danger argument fails based on the previously mentioned policy concerns surrounding the Fourteenth Amendment Due Process Clause's interaction with state tort law. In rejecting the state-created danger argument, the Fourth Circuit in Waybright relied on Collins v. City of Harker Heights, Texas, 503 U.S. 115 (1992), in which the Supreme Court held that "due process does not impose a duty on municipalities to provide their employees with a safe workplace or warn them against risks of harm (though state tort law may)." Waybright, 528 F.3d at 207. Recognizing that there were factual differences between the situations presented by Collins and the case before it, the Fourth Circuit reached below the facts in Collins and took hold of the underlying policy concern announced by the Supreme

Court—that "constitutional law would push state tort law aside whenever a state or local government acted as employer." Id. at 207–08. After identifying the Collins Court's underlying fear, the Fourth Circuit "expressed concern for any theory of substantive due process rights that 'would potentially set up a federal question whenever an accident happens during activities sponsored by the state.'" J.S. ex rel Simpson v. Thorsen, 766 F. Supp. 2d 695, 711 (E.D. Va. 2011) (quoting Waybright, 528 F.3d at 208); see also Waybright, 528 F.3d at 208 ("To transform ordinary mishaps into constitutional questions would not only bring them into federal court more frequently. Because Congress and the federal judiciary often set the ground rules for those claims . . . , the displacement of state law with federal policies would be difficult to overstate.").

As mentioned above, the type of injury that occurred in the instant case is one which also falls within the ambit of state tort law. Accordingly, determining that a state-created danger existed in this case would supplant the state tort law that safeguards the same interests that the plaintiff seeks to protect through these § 1983 claims.[7] In reaching this conclusion, the court notes its duty to exercise judicial "self-restraint" and the "utmost care" in determining that conduct violates substantive due process rights. Waybright, 528 F.3d at 205 (quoting Collins, 503 U.S. at 125); see also Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (en banc) ("[C]ourts must be reluctant to expand the concept of substantive due process because the guideposts for responsible decision-making in this uncharted area are scarce and open-ended, which means that the courts must exercise the utmost care whenever we are asked to break new ground in this field . . . ." (internal quotation marks and citations omitted)). Furthermore, the court observes that, although the Fourth Circuit "has recognized the existence of the state-created

---

[7] Although the Fourth Circuit in Waybright confined its analysis of this policy concern to its consideration of the specific state-created danger doctrine, Waybright, 528 F.3d at 207–08, this policy applies with equal force to the court's rejection of the first ground that gives rise to the state's affirmative duty to protect—an affirmative act of involuntary restraint by the state.

danger doctrine, it has not, to this [c]ourt's knowledge, been faced with a set of facts justifying its application." J.S. ex rel Simpson, 766 F. Supp. 2d at 710.

Finally, apart from the fact that the plaintiff fails to plead sufficient facts to trigger the state's affirmative duty to protect him, the plaintiff also fails to plead facts showing that the defendants' alleged conduct shocks the conscience. See Cnty. of Sacramento, 523 U.S. at 846 (stating that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'" (quoting Collins, 503 U.S. at 129)); Breithaupt v. Abram, 352 U.S. 432, 435 (1957) (emphasizing that conduct violates substantive due process rights when it "'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency"); see also, e.g., Rochin v. California, 342 U.S. 165, 172–73 (1952) (finding that the forced pumping of a suspect's stomach to probe for drugs shocked the conscience and violated the "decencies of civilized conduct" to the extent that it transgressed the suspect's due process rights).

Although the facts as alleged in the amended complaint relate an unfortunate, and undoubtedly distressing, series of events, the facts nonetheless fail to trigger the state's affirmative duty to protect, and likewise fail to allege conduct that rises to the level of shocking the conscience. Hence, because the plaintiff's Fourteenth Amendment substantive due process rights were not implicated by the facts as alleged in the amended complaint, the amended complaint fails to state a § 1983 claim upon which relief may be granted. For this reason, the court must dismiss the § 1983 claims pursuant to 28 U.S.C. § 1915(e)(2)(B).

## II. Technical battery claim

Under Count III of his amended complaint, the plaintiff brings a technical battery claim against UVA Care, alleging that UVA Care exceeded the scope of his consent to the drug study when it employed "intense questioning" techniques during the course of the study. This claim is

17

premised entirely on Virginia law. As such, this claim, unlike the plaintiff's § 1983 claims, fails to invoke the court's federal question jurisdiction. 28 U.S.C. § 1331. Likewise, because the plaintiff seeks only $36,903.60 in compensatory damages and an unspecified amount in punitive damages, this claim fails to trigger the court's diversity jurisdiction. Id. § 1332. Accordingly, because the court will dismiss the only claims in this action over which it has original jurisdiction—the plaintiff's § 1983 claims—the court will decline to exercise supplemental jurisdiction over the state law technical battery claim. Id. § 1367(c)(3). Therefore, the plaintiff's technical battery claim must be dismissed.

## Conclusion

For the foregoing reasons, the court concludes that the plaintiff's amended complaint must be dismissed—the § 1983 claims must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and the technical battery claim must be dismissed pursuant to the court's decision to decline to exercise supplemental jurisdiction over this claim. The Clerk is directed to send a certified copy of this memorandum opinion and the accompanying order to the plaintiff.

ENTER: This 16th day of December, 2011.

/s/ Glen Conrad
Chief United States District Judge